No. 16-0903 – *Pratt & Whitney Engine Services v. Steager*

LOUGHRY, Chief Justice, joined by WORKMAN, Justice, dissenting:

**FILED**

**November 1, 2017**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

The Freeport Amendment to the *West Virginia Constitution*, both in its language and intent, plainly provides an exemption from taxation for personal property which is stored or maintained for a period of time within the State insofar as it substantially maintains its character upon departing the State. The majority disregards the plain language of the Amendment and its analysis is devoid of even the most rudimentary exercise in logic. Most importantly, however, the majority disregards fully the Legislature's edict that the Amendment is to be liberally construed in favor of exemption. Therefore, I dissent to the majority's conclusion that the component engine parts housed by the petitioner Pratt & Whitney Engine Services (hereinafter "Pratt") in aid of their repair services are subject to *ad valorem* tax.

It is undisputed herein that Pratt operates a jet engine repair and service facility; to conduct this business it is necessary that it maintain an inventory of replacement parts. Jet engines needing repair are shipped to Pratt and these *same* engines leave repaired. Pratt engages in absolutely no manufacturing of jet engines or any other product. The repair parts it maintains are used solely to affix or utilize in servicing jet engines in need of repair.

1

The Freeport Amendment provides that tangible personal property which is either 1) moving in interstate commerce through or over the territory of the State of West Virginia; or 2) consigned from outside the State to a warehouse within the State for storage in transit to a destination outside the State, is exempt from *ad valorem* tax. W. Va. Const. Art. 10, § 1c; *see also* W. Va. Code § 11-5-13. Critically, the Amendment expressly states that such property remains exempt even if "while in the warehouse the personal property is *assembled*, *bound*, *joined*, processed, disassembled, divided, cut, broken in bulk, relabeled, or repackaged for delivery, unless such activity results in a *new* or *different* product, article, substance or commodity, or one of different utility." (emphasis added); *see also* W. Va. Code § 11-5-13(b). West Virginia Code § 11-5-13a(b) further clarifies that such warehoused goods are exempt from taxation provided "no *substantial alteration* takes place" at the place of holding (emphasis added).

Clearly, the repair parts housed by Pratt can be fairly characterized as having been "assembled, bound, [or] joined" inasmuch as they are affixed to or integrated into a jet engine for purposes of repairing it. *Id.* The question then becomes—did such assembly, binding, or joining, of the repair parts create a "new" or "different" product? In a true manufacturing plant, the answer would be unquestionably "yes": the assembly of a variety of components ordinarily creates a new product, article, substance or commodity as such is the very nature of manufacturing. However, in Pratt's repair facility, the component parts are merely "assembled, bound, [or] joined," to an existing

2

product of discrete and unaltered utility: a jet engine. Replacing or otherwise utilizing a grommet or counterweight in a jet engine to repair it substantially alters neither the engine nor the component part itself. Neither the jet engine nor the component part has a differing utility upon leaving the facility: the jet engine serves the same function, as do its component parts. At best, it can be said that the component parts have now fully realized their intended utility, rather than sitting unused in a box. Therefore, they are exempt from *ad valorem* tax pursuant to the Freeport Amendment.

Despite this relatively effortless reasoning, the majority concludes that the inoperable jet engine and the warehoused component parts magically transform in character upon leaving Pratt's facility. In an exchange that the majority and the circuit court inexplicably deemed critical, Pratt's supply chain logistics manager agreed during his testimony with the profoundly obvious conclusion that a jet engine is a different product and has a different utility than an individual repair part such as a grommet or counterweight. Based upon this comically self-evident testimony *alone*, the majority concludes that the property is not exempt from taxation. ("Because Mr. Tucker testified that a repaired, functional jet engine is a different product with a different utility than the individual repair parts, we agree . . . that the repair parts are not exempt[.]").

The logical fallacy in this analysis, however, is that it presupposes that the component part—the personal property at issue—"becomes" the jet engine when it leaves

3

the Pratt facility and therefore is a "different" product, having a "different" utility. A component part, of course, does not transform into a jet engine upon leaving Pratt's facility; it remains the same component part. Nor does the jet engine which enters Pratt's facility leave a "new" or "different" product with differing utility—it is still a jet engine and in fact the *same* jet engine which entered the facility, maintaining the same use and purpose.

In scraping to reach its ultimate conclusion, the majority alternatively suggests that because a jet engine arrives inoperable and leaves functional, it therefore becomes a "different" product with a "different" utility in the process. This obtuse reasoning perhaps best reveals the majority's result-oriented handling. A broken jet engine is still a jet engine. A jet engine—operable or inoperable—has the same utility or purpose: to provide thrust for an airplane. The majority's desperate attempt to liken the limited manipulation of the personal property at issue—which is expressly permitted under the statute—to something tantamount to full-scale manufacturing fails under the weight of its own strained semantical logic.[1]

---

[1] In fact, the majority blithely refers to the repair of the engines on multiple occasions as a "manufacturing process . . . [that] results in a finished product" as though such a characterization is remotely accurate. This mischaracterization is a poorly disguised attempt to render its ultimate conclusion unassailable.

4

Perhaps the majority's most fundamental misunderstanding of the scope of the Freeport Amendment is its apparent belief that nothing short of pure, "hands-off" warehousing qualifies for the tax exemption. ("[O]ne of the purposes of the Freeport Amendment is to promote the warehousing industry in West Virginia. It is clear that Pratt is not engaged in the warehousing business.") However, the language of the Amendment itself belies this conclusion. Providing tax exemption to goods temporarily housed in the State which are not "substantial[ly] alter[ed]" during that time is the intended goal of the Amendment as per West Virginia Code § 11-5-13a(b). Nevertheless, it delineates a list of activities which presumptively do not substantially alter the goods and therefore does not destroy the exemption: assembly, binding, joining, processing, disassembling, dividing, cutting, breaking in bulk, relabeling, or repackaging for delivery. W. Va. Const. art. 10, § 1c; W. Va. Code § 11-5-13(b). Certainly these activities go well beyond passive storage. It is *only if* this activity has a transformative effect on the stored components or their purpose that the exemption is lost. As explained above, there is nothing transformative about replacing or using a grommet or counterweight in an effort to make repairs to a discrete, singularly-purposed product such that the product may actually be used for its intended purpose. To say this minimal utilization of the personal property at issue creates no "substantial alteration" of the personal property itself is an understatement.

5

In fact, the lone case to uphold this exemption is frankly even further removed from exemption than the instant case because the property therein was in fact altered in some fashion. In *Feroleto Steel Co., Inc. v. Oughton*, 230 W. Va. 5, 736 S.E.2d 5 (2012), this Court upheld a tax exemption for steel coils which were cut into narrower steel coils while being housed in a West Virginia facility. Finding that "the composition of the steel is not changed" simply by cutting it, the Court upheld the exemption and found such exemption consistent with the intent of the Amendment. *Id.* at 8-9, 736 S.E.2d at 8-9. In the instant case, however, the component parts at issue themselves are altered in no way—they are merely integrated into or affixed to the engine. If the modified steel coils in *Feroleto* are entitled to tax exemption, there can be little question that the wholly unaltered repair parts herein likewise qualify.

Finally, with scarcely a sentence of its own analysis, the majority brushes aside the statutory requirement that the Freeport Amendment be liberally construed in favor of the taxpayer with its conclusory statement that the inventory of repair parts simply does not fall within the exemption. West Virginia Code § 11-5-13a(a) expressly provides that "[i]t is the intent of the Legislature that the provisions of this section are to be liberally construed in favor of a person claiming exemption from tax [pursuant to the Freeport Amendment.]" Accordingly, even if one were to dignify the majority's dubious assessment that the personal property takes on a differing character once integrated into the repaired engines, liberal construction would demand that the countervailing

6

conclusion (that the property has in no way been "substantially altered" merely because it was affixed to the engines) must prevail to afford Pratt the tax exemption. Only by completely ignoring this countervailing argument—which, in fact, it does—can the majority reach a result against the exemption.

Accordingly, for the reasons set forth hereinabove, I respectfully dissent.